KLETT *v.* KLETT.

1. SPECIFIC PERFORMANCE—CONTRACTS—ORAL AGREEMENT TO CON-
VEY LANDS—PARENT AND CHILD.

Complainant, in a suit to specifically enforce an oral
contract to convey real and personal property to him in
consideration of support and services to be rendered to
the father and mother of complainant, was not entitled to
the relief prayed upon a record showing that they stipu-
lated as a part of the arrangement that if the son became
dissatisfied or the parties were unable to live peaceably
together he was not bound to continue to perform the
contract; that the condition so introduced into the con-
tract was a material provision thereof, and that the
parties had been unable to live together in peace.[1]

2. SAME—PERFORMANCE.

Where the defendants became dissatisfied and attempted
to terminate the arrangement without sufficient grounds,
after complainant had for ten years and upwards endeav-
ored in good faith to carry out the conditions of the con-
tract and had expended considerable sums upon the prop-
erty or farm in controversy in pursuance of the agreed
conditions, he was entitled to an equitable lien upon such
portion of the farm as was not exempt for homestead
purposes to reimburse him for the improvements made,
and the sums expended in maintaining his parents, after
deducting the amount received from the land.

3. HOMESTEAD—LIEN—DEEDS—ORAL CONTRACTS.

Rights growing out of an oral contract cannot affect the
homestead interest of the owner of real property or of his
wife.

Appeal from Muskegon; Sullivan, J. Submitted
January 29, 1913. (Docket No. 87.) Decided May
28, 1913.

[1]On the specific performance of an oral contract to devise
or convey land in consideration of performing services or fur-
nishing support where no possession taken or improvements
made, see notes in 15 L. R. A. (N. S.) 466 and 38 L. R. A. (N.
S.) 752.

Bill by Henry R. Klett against Christopher Klett and others for specific performance. From a decree for complainant, defendants appeal. Reversed.

*Cross, Vanderwerp, Foote & Ross,* for complainant.

*R. J. Macdonald* and *William H. Simpson,* for defendants.

OSTRANDER, J. The relief prayed for in the bill of complaint is that the court determine the rights and interests of complainant in a farm and personal property belonging to defendants; that an injunction issue restraining defendants from selling or disposing of the farm and personal property; that at the final hearing the injunction be made permanent during the lifetime of the defendants or until the further order of the court; and that the complainant have such other and further relief as to the court shall seem proper. In disposing of the case, the learned trial judge said:

"If the bill is not specific enough, the bill may be amended to pray for a specific performance of this contract, and a specific performance of the contract will be granted."

The decree which was entered finds that there was an arrangement between the complainant and the defendants, his father and mother, by which it was agreed that complainant, with his wife, should come upon the land, live with the defendants, care for them as long as they should live, and, as a consideration, should have the entire property of the defendants, including the farm; that complainant and his wife performed the agreement for ten years and upwards and until the 30th day of May, 1911, when defendant Christopher Klett, father of complainant, without cause and against the protest of complainant, left the

farm, refused to return there to live, and has since executed deeds of the real estate which were delivered and have been recorded, but not until after the filing of a notice of the pendency of this suit; that complainant is entitled to have the contract carried out and these deeds set aside. The decree is for specific performance and for the cancellation of the said deeds and for permanent injunction restraining the defendants from disposing of the real estate or personal property. It authorizes defendant Christopher Klett to return to the farm, make his home there—

"And both of said defendants are to be supported and cared for by said complainant and his wife on said farm as long as they shall live; that upon their death, in case said complainant performs his part of said contract, the said complainant will be entitled to the said real estate and personal property belonging to defendants situate thereon."

The real estate in question is owned by the defendants as husband and wife. The agreement which it is charged in the bill was made is that defendants proposed to complainant to come with his wife to the farm and live with defendants upon it and care for and support them, and if he would do so he could have everything there was upon the place and the farm when defendants were through with the property; that complainant accepted the proposition made by defendants and agreed to remove with his family from the city of Muskegon to the said farm of the defendants and work the said farm and care for and support the said defendants as long as they lived, with the understanding and agreement made by the said defendants that upon their death he (complainant) should have the entire property of the said defendants, including the farm.

The making of this agreement is denied by defendants in their joint answer, and whether any such

agreement was made is the principal question of fact in the case. Defendants also deny that complainant has cared for and supported them; that he has made valuable improvements upon the farm; that he has paid the taxes and insurance. They admit that complainant and his wife came to the farm to live in April, 1901, and say the arrangement was that complainant was to take the farm and work it, support defendants, live with them, do all the work in a workmanlike manner, furnish everything, have the proceeds, crops, and returns from the farm, pay all expenses and taxes, keep the buildings insured, do thereon what defendants theretofore had done, and remain as long as the parties should agree to the arrangement. When complainant became dissatisfied, he should redeliver the property delivered to him, replacing that which had been sold, parted with, worn out, or destroyed, so that defendants should again have their farm in as good condition as when taken or the equivalent thereof.

The legal propositions argued upon the part of the defendants are:

(1) That, under the arrangement claimed by complainant to exist, there was no obligation upon his part, and the alleged contract was not mutual.

(2) That there was no joint action on the part of the defendants in making the alleged arrangement with complainant, and that, the title being held by the defendants jointly, some joint action on their part was required.

(3) That defendants' homestead was upon the farm, and under the Constitution a parol agreement to dispose of the homestead interest is void; that, although the value and extent of the property exceed the statutory limits of a homestead, the alleged contract was an entirety and cannot be enforced as to the excess either of quantity or value.

(4) That if there was such a contract as complainant claims, and it was mutual, and no question of title

by the entireties or of homestead rights interfered, there could be no decree for specific performance because, defendants having become dissatisfied with the performance attempted by complainant, no court can interfere to supervise or direct the character of services agreed to be performed by the complainant.

After an examination of the testimony, I am satisfied that the complainant and his wife went to live upon the farm of the defendants, with the defendants, pursuant to an understanding and arrangement substantially, but not fully, stated by the trial judge. The father and mother both wanted the complainant to come with his wife and live with them, work the place, and take care of them. Both of them told him that if he did he could have the farm and whatever there was on it when they, or the survivor of them, died. There was, however, a contingency, a qualification, which is clearly evidenced by the testimony of the complainant, and, as I regard it as important, I refer particularly to the testimony. Complainant testified that, answering in person a letter which his mother had written to him, he had a conversation with her, the first one upon the subject and about the terms upon which he and his wife would live upon the farm. He said to his mother:

" 'My wife is practically a stranger to you, and she never was on a farm and didn't know anything about farming, and of course she would have to learn a whole lot; her ways wouldn't be your ways.' Well, she was willing to submit to anything; that she had had enough of this living the way they had had to live the two years that I was away. They didn't want to have to put up with that, and they didn't know what they was going to do if I didn't come. Well, I said to her, 'You know that you are kind of hard to get along with. You didn't get along with your own daughters very well, never did, and you wouldn't want a stranger to come into your house and run things.' Well, she said she didn't care. She said, 'I have had enough of this and I know;' and she said, 'You have

got an awful nice wife and that I like her; I think lots of her; and I don't see why we couldn't get along.' 'Well,' I said, 'I don't see why you couldn't either if you wanted to.' And she told me, too, that I needn't think that she was like some of the other old women that was around that country that had their sons living with them and had to skiddoo—get out because they couldn't stand it with them. She said, 'I don't want you to think I am like them. Do you think I am?' she says. I says, 'Well, I don't know. I can tell better after I have lived with you a while that way first;' and finally after we had talked along that way I told her that— Well, she said then, 'You can see father in the morning, and,' she said, 'I know it will be all right with him because we have talked about this and everything will be all right with him.' Well, of course I told her then that if everything would be satisfactory— She told me too, she said, 'You will have the place, and,' she said, 'you are the only one that is entitled to it anyhow, because you have been to home the most, and father will be willing to let you have it, and so will I, if you will only come.' Well, of course I wouldn't go under any consideration; I wouldn't go there for fun."

The complainant describes some of the difficulties which he and his wife had after they went to live upon the place. Upon one occasion his father and his wife were engaged in a quarrel of words, and complainant interfered.

"I told him he had better quit and that he had been talking about her a good deal, and I didn't calculate to say anything about it, 'but you started this now,' and I said, 'I will tell you.' He jumped up and said, 'If this is the feeling you have got we might as well break up.' I said, 'I am ready any time you are, providing you settle with me.' I said, 'When I left you before I left you with everything and I took nothing, but this time I want something.' He said, 'You ain't got nothing; you never had anything; and you can't get nothing.' And he talked pretty mean to me and my wife. * * * During the ten years that I have been on the place, when we had little troubles, my

wife and my mother, I would speak about leaving, and my mother would say then when she would think I was going to leave because I had told them— I said if we had any trouble that I wouldn't stay, and as soon as they would have it I would say, 'I will leave; I ain't going to stay here and live if you can't live peaceably together.' She would say, 'There is no need of your going. You are going to get the place anyhow. No one else wants it. Why don't you stay?' And then I said, 'Why don't you let us alone so that we can stay if you want us to?'"

His attention being directed to a particular trouble occurring some five years before the cause was tried, complainant testified:

"We had been having quite a little serious trouble then with my mother, five years ago last September. I told my father that I couldn't stand it any longer; that mother and my wife couldn't get along; and that it didn't make it pleasant for us. And that I was going to leave, told him I wanted to settle up and move, and he didn't know what to do. We talked along for three or four days that way, and finally he came to me one day (I was out in the field husking corn), and he says, 'Henry,' he says, 'I can't have you go.' He said, 'If you do, it is going to break up the home. Then,' he said, 'I won't have any.' He said, 'If you are going to go and we have got to divide up, then,' he says, 'you won't have no home and I won't have any. Of course,' he said, 'I can go and live with Louis if I want to, but I don't want to do it. I want to stay here. I want to live and die here.' 'Well,' I said, 'I would like to stay, but,' I said, 'I can't do it.' I said, 'The place isn't worth the trouble that I am having over it.' That is, I meant the trouble we was having in the family. I said, 'I would rather lose everything than to have to live this way any longer.' 'Well,' he said, 'you know your mother is crazy, and,' he says, 'I have had to live with her all these years and you ought to stand it a little while.' 'Well,' he said, 'You know she has either got an ugly disposition or else she is crazy; I don't know which.' * * * And I said, 'You will have to talk with my wife about it; if

she won't stay I won't; I can't have this any longer.' So he went and talked with her about it, and he fixed it up with her so that we stayed, on his account principally. * *. * After this arrangement was made five years ago, it went worse for a couple of years; that is, with the women, my mother, she didn't like it. She didn't like the arrangement father made with us. And so she made it pretty warm for him. This second arrangement, you know, she didn't like that very well, and so—

"*Q.* You mean she would rather you had gone?

"*A.* She would rather we had went at that time. That is what she said, but the fact of the matter was she never wanted us to go, because when we would have trouble and I would speak about leaving—she did after that—I told her I wouldn't stay; I would just as soon leave as not anyhow. When she thought I meant it she would say, 'There is no need of your going, you are going to get the place anyhow.'"

Complainant's last trouble was with his father, who himself left the farm, and, if complainant is to be believed, without any adequate excuse. This testimony of complainant supports, to some extent, the claim of defendant that there was an understanding, or that it was a part of the understanding and arrangement entered into, that complainant was not bound, in any event, to remain upon the land and support defendants. And I think we are required to find that such was the understanding. I am as well convinced, from the testimony, that the reason and only reason for this reservation was the contingency that the parties should not be able to live together in peace, and that there was involved a mutual undertaking to do nothing to disturb the peace. The arrangement was of considerable importance to all of them, and as time passed it became more imperative that amicable relations be maintained. Otherwise complainant might work for years agreeably with the understanding and then find himself ousted by the declaration of defendants that they were dissatisfied. Such a condition

of things is, in my opinion, presented by the record. Complainant has for ten years reasonably performed the agreement. Defendants now attempt to dispossess him, empty-handed, claiming they are dissatisfied. Under such circumstances, may a court of equity grant complainant any relief? The court cannot compel the parties to live together, nor can it harmonize their differences. It can inquire whether defendants are wholly at fault; whether they are honestly and reasonably dissatisfied. If they are at fault and acting from caprice and without reason, it should, if it can, award to complainant some compensation. I am of opinion that defendants are at fault and that it would be inequitable to dismiss complainant without some compensation.

Does the law interpose insuperable obstacles in the way of granting relief? No question of the statute of frauds is involved. The land consists of 200 acres, some of it in a lake, about 147 acres of it dry land. The title, when complainant entered upon the performance of the agreement, and until recently, when defendants attempted to convey it away, was held by defendants jointly, as husband and wife. Both of them understood, were parties to and joined in the contract and agreement with complainant. These facts present no legal obstacle to granting relief.

Defendants had lived on the land for 30 years, and it appears to be admitted they have no other home, and that they have a homestead interest in the land. It does not appear that they have selected and set apart any particular 40 acres as a homestead. Neither the contract nor any rights growing out of it can affect the homestead interest. *Lott* v. *Lott*, 146 Mich. 580 (109 N. W. 1126, 8 L. R. A. [N. S.] 748), and cases cited in the opinion. There are 100 acres of land unaffected by the homestead interest.

Upon this record, the decree will be that the decree

of the court below be reversed; that defendants be
given leave and opportunity for 30 days to select and
designate a homestead in the land; that complainant
have a lien upon the remainder of said land and the
personal property for his rightful compensation,
which may be enforced by a sale or by partition; that
the record be remanded to the circuit court for the
county of Muskegon, in chancery, to ascertain and
determine the value of the premises at the time com-
plainant began performance of his contract and now,
and if said land has increased in value to ascertain
and determine whether, and to what extent, the in-
crease in value is the result of complainant's work
and the improvements he has made upon the same,
and how much is due to other causes; that a like ascer-
tainment and determination be made with respect to
the personal property; that the court also ascertain
and determine what sum and sums, if any, complain-
ant has expended, over and above the sums realized
from said land, to maintain defendants, himself and
family; that complainant be finally decreed to be en-
titled to receive of and from defendants the amount
of the increased value of real and personal property
due to his work and to the improvements he has made,
and such sums as he has expended over and above
those received from the land in the support of the
family, including defendants. The result may or may
not appear to give adequate compensation to complain-
ant. However, it will be in addition to all such sup-
port and sums as he has derived from the premises
during his occupancy thereof. His tenure has at all
times been somewhat precarious, and, considering his
reserved right to leave when conditions became un-
supportable, I can discover, after reflection, no more
equitable adjustment of the respective rights of the
parties. Neither party as against the other will re-
cover costs of this appeal; but the cost of preparing

and printing the record will be equally divided between complainant and defendants.

A decree will be entered in this court agreeably with this opinion, and the record remanded for further proceedings.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, KUHN, STONE, and BIRD, JJ., concurred.